No. 25-1323

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

_____

C.B., AND R.B.,

*Plaintiffs - Appellants*

v.

BLUE CROSS AND BLUE SHIELD OF ILLINOIS AND MONDOLEZ GLOBAL LLC GROUP
BENEFITS PLAN

*Defendants, Appellees.*

_____

On appeal from the United States District Court for the Northern District of
Illinois, Eastern Division, Case No. 23-cv-01206
The Honorable Mary M. Rowland

_____

**BRIEF OF APPELLANTS**

*ORAL ARGUMENT REQUESTED*

_____

Brian S. King, Utah Bar No. 4610
BRIAN S. KING P.C.
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: 801-532-1739
Facsimile: 801-532-1936
brian@briansking.com

*Counsel for Appellants C.B. and R.B.*

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-1323

Short Caption: C.B. v. Blue Cross and Blue Shield of Illinois, et al

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

C.B. and R.B.

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Brian S. King, P.C.

(3)   If the party, amicus or intervenor is a corporation:

i)   Identify all its parent corporations, if any; and

ii)   list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: s/ Brian S. King    Date: 8/21/2025

Attorney's Printed Name: Brian S. King

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☑ **No** ☐

Address: 420 Eeast South Temple, Suite 420

Salt Lake City, UT 84111

Phone Number: (801) 532-1739    Fax Number: (801) 532-1936

E-Mail Address: brian@briansking.com

rev. 12/19 AK

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................2

TABLE OF AUTHORITIES..........................................................3

JURISDICTIONAL STATEMENT ................................................4

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ...........4

STATEMENT OF THE CASE .......................................................5

SUMMARY OF THE ARGUMENT .................................................11

ARGUMENT ...........................................................................11

   I.   STANDARD OF REVIEW. .....................................................11

   II.  THE DISTRICT COURT ERRED WHEN IT FOUND THAT A
FACIALLY NEUTRAL TREATMENT LIMITATION APPLIED ACROSS
THE BOARD TO ANALOGOUS MENTAL HEALTH AND
MEDICAL/SURGICAL TREATMENT CANNOT VIOLATE MHPAEA. ......12

   III.   DEFENDANTS AND THE COURT IMPROPERLY RELIED ON
FACTUAL FINDINGS INAPPROPRIATE AT THE MOTION TO DISMISS
STAGE.................................................................................23

   IV.   DISMISSAL OF PLAINTIFFS' SECOND CAUSE OF ACTION WAS
ALSO INAPPROPRIATE. ..........................................................24

CONCLUSION .........................................................................25

STATEMENT WHY ORAL ARGUMENT IS NECESSARY .............26

CERTIFICATE OF COMPLIANCE WITH FRAP RULE 32(a)(7), FRAP RULE
32(g), AND CR 32(c)...............................................................27

CERTIFICATE OF SERVICE........................................................28

CIRCUIT RULE 30(d) STATEMENT .................................................29

# TABLE OF AUTHORITIES

**Cases**

*Brian W. v. Health Care Serv. Corp.*, 2025 U.S. Dist. LEXIS 13773 (N.D. Ill. Jan. 27, 2025) ...................................................................................................24

*C.M. v. Health Care Serv. Corp.,* 2025 U.S. Dist. LEXIS 57306, *7 (N.D. Ill. March 27, 2025)............................................................................................19, 25

*Calderon-Ramirez v. McCament*, 877 F.3d 272 (7th Cir. 2017)............................11

*Chaidez v. Ford Motor Co.*, 937 F.3d 998 (7th Cir. 2019) ....................................11

*Danny P. v. Catholic Health Initiatives*, 891 F.3d 1155 (9th Cir. 2018) ...............25

*E.W. v. Health Net Life Ins. Co.*, the Tenth Circuit recently articulated a pleading standard that suits most MHPAEA claims. 86 F.4th 1265 (10th Cir. 2023).12, 13, 20

*Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329 (7th Cir. 2018)........23

*M.S. v. Premera Blue Cross*, 118 F.4th 1248 (10th Cir. 2024)..............................19

*M.S. v. Premera Blue Cross*, 553 F. Supp. 3d 1000, 1028-29 (D. Utah 2021).......19

*Midthun-Hensen v. Group Health Coop. of S. Cent. Wis., Inc.*, 672 F. Supp. 3d 662, 678 (W.D. Wis. 2023)...................................................................................19

*REI Transp., Inc. v. C.H. Robinson Worldwide, Inc.*, 519 F.3d 693 (7th Cir. 2008) ...........................................................................................................................25

*Ryan S. v. UnitedHealth Group, Inc.*, 98 F.4th 965 (9th Cir. 2024) ...........16, 17, 19

*Smith v. Golden Rule Ins. Co.*, 526 F. Supp. 3d 374, 386-90 (S.D. Ind. 2021).......19

*Stone v. UnitedHealthcare Ins. Co.*, 979 F.3d 770, 774 (9th Cir. 2020).................15

*Swanson v. Citibank*, 614 F.3d 400, 404 (7th Cir. 2010). ......................................14

**Statutes**

28 U.S.C.S. § 1331 ...................................................................................................4

29 U.S.C.S. § 1132 ...................................................................................................4

29 U.S.C.S. §§ 1001 .................................................................................................4

29. U.S.C. § 1185a(7)(C) ...............................................................................7, 13, 15

**Rules**

Fed. R. Civ. P. 12(b)(6)....................................................................................11, 23

**Regulations**

29 C.F.R. § 2590.712 .........................................................................................7, 13

## JURISDICTIONAL STATEMENT

Plaintiffs raised claims under the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C.S. §§ 1001 through 1461. The district court had jurisdiction to hear Plaintiffs' claims under 29 U.S.C.S. § 1132(e)(1) and 28 U.S.C.S. § 1331. The district court issued an opinion granting Defendants' motion to dismiss on February 18, 2025. Plaintiffs filed a timely notice of appeal on February 26, 2025.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

**Issue 1**: Did the district court err when it determined that Plaintiffs are "preclude[d]" from "stating a [MHPAEA] violation" when an ERISA plan applies a facially neutral Plan term "to both analogues equally?"

**Answer**: Yes, the district court erred. Guidance from the Department of Labor and authority from various jurisdictions demonstrate that facially neutral plan terms can lead to MHPAEA violations in application or operation. Plaintiffs pled that the across-the-board application of certain Plan terms resulted in Defendants applying more stringent limits to coverage for residential mental health treatment than on coverage for analogous medical/surgical treatment. This should have been sufficient to state a MHPAEA violation.

**Issue 2:** Did the district court err when it determined that Plaintiffs' benefit claims should also be dismissed?

**Answer:** Yes, the district court erred. Plan terms that allegedly violate MHPAEA are precluded from justifying dismissal of a benefits claim, because dismissal of the benefits claim would necessarily rely on a merits judgment as to the MHPAEA claim inappropriate at the motion to dismiss stage.

## STATEMENT OF THE CASE

1. The Mondolez Global LLC Group Benefits Plan (the "Plan") is a self-funded employee welfare benefits plan under ERISA. *See* ECF 79 (the District Court's Order) at 1.

2. Blue Cross Blue Shield of Illinois ("BCBSIL") is a fiduciary under ERISA for the Plan. ECF 79 at 1.

3. C.B. , R.B.'s mother, is a participant in the Plan and R.B. was a beneficiary during the time of the events that gave rise to this litigation. ECF 79 at 1-2.

4. R.B. has a history of severe anxiety, depression, suicidal thoughts, and aggressive behaviors. ECF 79 at 2.

5. R.B. received treatment for his mental health disorders at Triumph Youth Services ("Triumph"), a licensed residential treatment center ("RTC") located in Box Elder County, Utah. ECF 79 at 2.

6. BCBSIL repeatedly denied claims for payment of R.B.'s medical expenses at Triumph and C.B. repeatedly appealed the denials. ECF 79 at 2.

7. As pertinent here and as the district court observed below:

> BCBSIL denied the appeal because the Plan only covered treatment at RTCs as they are defined in the Plan, and the Plan's definition of an RTC requires there to be "24 hour medical availability and 24 hour onsite nursing service for patient[s] with Mental Illness and/or Substance Use Disorders." Because Triumph did not require a 24-hour onsite nursing presence, BCBSIL claimed denial was appropriate.

> ECF 79 at 2 (citations omitted).

8. C.B. exhausted her administrative remedies and brought this lawsuit. ECF 79 at 6.

9. An initial motion to dismiss was granted without prejudice, *see* ECF Doc. No. 54.

### *The Instant Appeal*

10. Plaintiffs filed an amended complaint that contained two causes of action: (1) a claim that BCBSIL had violated the Mental Health Parity and Addiction Equity Act ("MHPAEA"); *see* ECF Doc. No. 55 ¶¶ 36-81; and (2) a claim for wrongful denial of benefits under ERISA based on the logic that BCBSIL would not have denied coverage for R.B.'s treatment if it had not violated MHPAEA. *See* ECF Doc. No. 55 ¶¶ 82-91.

11. MHPAEA requires that, in administering an insurance plan subject to ERISA, "the treatment limitations applicable to such mental health or substance use disorder benefits are no more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan[.]" 29 U.S.C. § 1185a(a)(3)(A)(ii).

12. MHPAEA further clarifies that the term "treatment limitations" includes the "methods, processes, strategies, evidentiary standards, and other factors" that ERISA administrators use to "*apply*" written treatment limitations in the Plan. 29 U.S.C. § 1185a(7)(C) (emphasis added); *see also* 29 C.F.R. § 2590.712(c)(4) (observing that the terms of a plan "as written *and in operation*" violate MHPAEA if they impose a more stringent barrier to coverage for mental health treatment than to coverage for analogous medical/surgical treatment (emphasis added)).

13. Plaintiffs alleged, and Defendants agreed, that skilled nursing facilities are a medical/surgical analogue to the residential mental health treatment R.B. received in this case. *See* ECF Doc. No. 79 at 6.

14. The Plan also requires that skilled nursing facilities ("SNFs") have 24/7 nursing presence to the extent they are required to by "guidelines established by Medicare." ECF 79 at 6.[1]

15. Plaintiffs asserted four specific framings of their MHPAEA claim, but the gist of all of them was that requiring residential mental health treatment facilities to have 24/7 onsite nursing exceeds the generally accepted standards of care for those facilities. *See* ECF Doc. No. 55 ¶¶ 36-81.

16. Plaintiffs then alleged that 24/7 onsite nursing is the generally accepted standard of care for skilled nursing facilities.

17. Defendants moved to dismiss Plaintiffs' complaint, arguing that they had not stated a claim upon which relief could be granted. *See* ECF Doc. No. 63.

18. The Court dismissed Plaintiffs' MHPAEA cause of action, finding:

> The problem for Plaintiffs is that Defendants apply the same treatment limitation—a 24-hour nursing presence requirement—to both RTCs and their medical/surgical analog, SNFs. Plaintiffs argue that because the Plan's definition of RTCs explicitly requires a 24-hour nursing presence while the Plan's definition of SNFs does not, the Plan contains a disparate treatment limitation. But the

---

[1] In practice, the Medicare guidelines do not require that all skilled nursing facilities have 24/7 on-site nursing. They are riddled with exceptions. However, for purposes of this appeal and the underlying briefing before the district court, Plaintiffs do not dispute that the Plan requires skilled nursing facilities to have 24/7 onsite nursing.

Plan provides that it will only cover SNFs that are "certified in accordance with the guidelines established by Medicare." [64-1] at 32. And the relevant Medicare regulations require a 24-hour nursing presence for SNFs. *See* 42 U.S.C. § 1395i- 3(b)(4)(C)(i). Thus, the Plan imposes the same 24-hour requirement on both RTCs and SNFs. There is "no disparity between the treatment limitation imposed [MH/SUD] benefits as compared to the limitations that defendants would apply on the medical or surgical analog." *E.W.*, 86 F.4th 1265 at 1283.

Plaintiffs also argue that Defendants apply "more stringent internal processes" to RTCs than SNFs, as contemplated by the Ryan S. test. Plaintiffs suggest that the 24- hour requirement is a more stringent internal process because the 24-hour nursing requirement is medically necessary at SNFs but goes beyond what is medically necessary at RTCs. They also argue that the plan imposes extra licensure requirements on RTCs that are not imposed on SNFs, and that the 24-hour requirement exceeds GASC for RTCs but not for SNFs. But the *Ryan S.* court's reference to an "internal review process" referred to the review process that an insurer undertakes in reviewing specific claims, not the kind of categorical process by which the Plan defines RTCs and SNFs that Plaintiffs take issue with here. *See Ryan S.*, 98 F.4th at 973. Plaintiffs' allegations regarding GASCs and medical necessity are of another matter entirely than what the court in Ryan S. contemplated.

But even if the Court adopted a broader view of an "internal review process," Plaintiffs' Parity Act claim would still fail because the relevant treatment limitation is equally applied for RTCs and SNFs. Plaintiffs take issue with the fact that the Plan applies the *same* treatment limitation on RTCs and SNFs, not that the Plan applies different treatment limitations. Plaintiffs may well be right that, for example, the 24-hour nursing requirement is medically necessary for SNFs but not for RTCs, or that the requirement goes beyond RTCs'

9

[generally accepted standards of care], but the fact that the Plan applies the treatment limitation to both analogues equally precludes Plaintiffs from stating a Parity Act violation. *See* 29 C.F.R. § 2590.712(c)(2)(ii)(C)(2) (a treatment limitation applied equally to medical/surgical benefits and MH/SUD does not violate the Parity Act). As for the Plan's licensing requirements, there is no requirement in the Parity Act that ERISA plans do not place higher standards on treatment centers than those required by state licensing as long as the standards are applied equally. *See L.P. v. BCBSM, Inc.*, No. 18-cv-1241, 2020 WL 981186, at *7 (D. Minn. Jan. 17, 2020). These allegations are insufficient to state a Parity Act claim.

ECF Doc. No. 79 at 6-7 (footnote omitted).

19. The Court finished its MHPAEA analysis by expressing it was "deeply frustrated" and saying: "As it stands now, [MHPAEA], despite its goal of requiring insurance companies to cover care for mental health, leaves plaintiffs like R.B. unable to state a claim *for the care he needed and properly received* for his mental health challenges." ECF Doc. No. 79 at 8 (emphasis in original).

20. Because Plaintiffs' claim for wrongful denial of benefits was dependent on their MHPAEA claim surviving, the Court dismissed that claim as well. *See* ECF Doc. No. 79 at 8.

//

//

//

10

# SUMMARY OF THE ARGUMENT

Plaintiffs' amended complaint presented several detailed explanations for why Defendants violated MHPAEA by imposing more stringent limits on coverage for residential mental health treatment than analogous medical/surgical treatment. Under Fed. R. Civ. P. 12(b)(6), the district court was required to assume all of Plaintiffs' pled facts were true and draw all inferences in their favor when evaluating Defendants' motion to dismiss this amended complaint. Instead, the district court found as a matter of law that Plaintiffs are "precluded" from stating a claim for MHPAEA violations as long as Defendants apply facially neutral plan terms to both residential mental health treatment and its analogues. This misunderstands what MHPAEA requires to state a cause of action for violation of the statute. Accordingly, Plaintiffs ask the Court to reverse the district court's findings and allow Plaintiffs to proceed on their complaint.

# ARGUMENT

## I.     STANDARD OF REVIEW.

The Seventh Circuit reviews a district court's decision to dismiss a complaint *de novo*, "accepting as true the complaint's well-pleaded allegations and drawing all reasonable inferences in the plaintiffs' favor." *See Chaidez v. Ford Motor Co.*, 937 F.3d 998, 1005 (7th Cir. 2019) (citing *Calderon-Ramirez v. McCament*, 877 F.3d 272, 275 (7th Cir. 2017)).

## II. THE DISTRICT COURT ERRED WHEN IT FOUND THAT A FACIALLY NEUTRAL TREATMENT LIMITATION APPLIED ACROSS THE BOARD TO ANALOGOUS MENTAL HEALTH AND MEDICAL/SURGICAL TREATMENT CANNOT VIOLATE MHPAEA.

The Seventh Circuit has yet to articulate a standard for pleading that an ERISA plan or administrator violated MHPAEA. However, in *E.W. v. Health Net Life Ins. Co.*, the Tenth Circuit recently articulated a pleading standard that suits most MHPAEA claims. 86 F.4th 1265 (10th Cir. 2023). The Tenth Circuit found that to assert a valid MHPAEA claim, a Plaintiff must:

(1) plausibly allege that the relevant group health plan is subject to MHPAEA;

(2) identify a specific treatment limitation on mental health or substance-use disorder benefits covered by the plan;

(3) identify medical or surgical care covered by the plan that is analogous to the mental health or substance-use disorder care for which the plaintiffs seek benefits; and

(4) plausibly allege a disparity between the treatment limitation on mental health or substance-use disorder benefits as compared to the limitations that defendants would apply to the medical or surgical analog.

86 F.4th at 1283.

MHPAEA further clarifies that the term "treatment limitations" includes the "methods, processes, strategies, evidentiary standards, and other factors" that ERISA administrators use to "apply" written treatment limitations in the Plan. 29.

12

U.S.C. § 1185a(7)(C); *see also* 29 C.F.R. § 2590.712(c)(4)(i) (observing that the terms of a plan "as written and *in operation*" violate MHPAEA if they impose a more stringent barrier to coverage for mental health treatment than to coverage for analogous medical/surgical treatment (emphasis added)).

With the *E.W.* elements in mind, Plaintiffs' MHPAEA claims are simple. Plaintiffs allege first that the Plan is subject to MHPAEA and that skilled nursing facilities are a medical/surgical analogue to the residential mental health treatment R.B. received in this case. This should have been sufficient, at the motion to dismiss stage, for the district court to determine Plaintiffs adequately pled the first and third elements for all of their MHPAEA claims. For the remaining two elements, Plaintiffs identified four separate treatment limitations and explained how each results in Defendants imposing more stringent limits on coverage for residential mental health treatment than they place on analogous medical/surgical treatment.

Specifically, Plaintiffs pled: (1) that 24/7 onsite nursing is not medically necessary or generally accepted practice for residential treatment and *is* medically necessary and generally accepted for skilled nursing, so requiring 24/7 onsite nursing for both restricts coverage for the former significantly more than the latter (*See* ECF Doc. No. 69 at 10); (2) that the Plan's facility definition for residential treatment is more restrictive than its definition for skilled nursing facilities and that

this restricts coverage for residential treatment more than coverage for skilled nursing (*see id.* at 5-6); (3) that Defendants internal processes for handling residential mental health treatment claims deviate from its guiding principle to provide "medically necessary" care, whereas Defendants' internal processes for handling skilled nursing claims do not deviate from its medical necessity mandate (*see id*. at 6-8); and (4) that the 24/7 onsite nursing requirement results in Defendants excluding coverage for appropriately licensed residential treatment facilities, but Defendants do not exclude coverage for any appropriately licensed skilled nursing facilities, creating an obvious disparity.[2]

All four of Plaintiffs' asserted MHPAEA violations should have been sufficient to survive on a motion to dismiss standard. The court was required to find all facts and draw all inferences in Plaintiffs' favor, and should have allowed Plaintiffs' claims to proceed to discovery if they alleged just "enough details about the subject-matter of the case to present a story that holds together." *Swanson v. Citibank*, 614 F.3d 400, 404 (7th Cir. 2010). Plaintiffs have more than met this standard, and the district court erred by dismissing Plaintiffs' claims.

In the first paragraph of its analysis, the district court stated:

---

[2] Of these four, the first violation Plaintiffs identified is the clearest and most important. Defendants created a facially neutral 24/7 onsite staffing requirement that they apply dispassionately to both residential treatment and skilled nursing facilities, but the impact of that facially neutral requirement is to precipitously reduce coverage for residential treatment without affecting coverage of skilled nursing facilities to a meaningful degree. The other three MHPAEA theories Plaintiffs assert are very closely related to this underlying issue.

The Parity Act requires that any limitations on "mental health or substance use disorder benefits" (hereinafter, "MH/SUD") *in an ERISA plan* be "no more restrictive than the predominant treatment limitations applied to substantially all [covered] medical and surgical benefits." 29 U.S.C. § 1185a(a)(3)(A)(ii). Thus, to succeed on a claim under the Parity Act, a plaintiff must show that *an ERISA plan* that offers both medical/surgical benefits and mental health benefits imposed a more restrictive limitation on mental health/substance use disorder MH/SUD [sic] treatment than limitations on treatment for medical and surgical issues. *See Stone v. UnitedHealthcare Ins. Co.*, 979 F.3d 770, 774 (9th Cir. 2020).

ECF Doc. No. 79 at 5 (emphases added).

The district court's misunderstanding of what is necessary to state a MHPAEA claim is made clear when it states "the fact that the Plan applies the treatment limitation to both [residential treatment and skilled nursing facilities] equally precludes Plaintiff from stating a [MHPAEA] violation." ECF Doc. No. 79 at 7.

The district court misapprehended the broad universe of articulable MHPAEA violations because it narrowed the court's focus solely to whether the language in the Plan, without reference to its actual effects in operation, imposes treatment limitations on residential treatment facilities that are different from the limitations imposed on skilled nursing facilities. The court's framing of the MHPAEA question did not take into account that an ERISA plan or administrator can violate MHPAEA using a facially neutral Plan term if the *effect* of applying

15

that term imposes more stringent limitations on mental health coverage than on analogous medical/surgical coverage.

Instead, as the Ninth Circuit observed in *Ryan S. v. UnitedHealth Group, Inc.*, there are "different ways" an "ERISA plan can violate the Parity Act[,]" including: (1) explicitly excluding "some form of treatment for MH/SUD issues that is offered for comparable medical/surgical issues;" (2) applying "a facially neutral plan term in an unequal way between MH/SUD and medical/surgical benefits;" or (3) applying "a more stringent internal process to MH/SUD claims than to medical/surgical claims." 98 F.4th 965, 969 (9th Cir. 2024). Here, the Plan imposes a facially neutral requirement on both residential treatment and skilled nursing facilities that both must have 24/7 onsite nursing. However, as the district court acknowledged, *see* ECF Doc. No. 79 at 7-8, Plaintiffs allege that *in application*, this facially neutral Plan provision imposes a more stringent treatment limitation on residential mental health treatment than it imposes on analogous medical/surgical treatment.

The district court indicated that Plaintiffs' claims are not the sort contemplated by *Ryan S.*, *see* ECF Doc. No. 79 at 6-7, but it simply misunderstood that case. The district court incorrectly concluded that the Ninth Circuit's ruling in *Ryan S* contemplated "the review process that an insurer undertakes in reviewing *specific claims*, not the kind of categorical process… that Plaintiffs take issue with

here." *See* ECF Doc. No. 79, at 7 (emphasis added). *Ryan S.* stands for the proposition that as long as there is "some reason to believe that the denial of [mental health or substance use disorder] claims was impacted by a process that does not apply to medical/surgical claims" then that states a MHPAEA violation. 98 F.4th at 973. While the *Ryan S.* court indicated claimants did not need to prove a "categorical" practice, it specifically noted that "[h]andling of [mental health and substance use disorder] claims more stringently violates the Parity Act regardless of whether such differential treatment leads to the uniform denial of all claims." 98 F.4th at 972. To the extent the Ninth Circuit referenced "specific claims" at all, it did so when clarifying that all a Plaintiff needed to allege was that the "challenged process" is "specific to [mental health and substance use disorder] claims" in order to meet the plausibility pleading standard. *Id*, at 973.

Here, Plaintiffs' MHPAEA theories are very similar. They argue that Defendants refused to consider the disparate impact of imposing requirements for coverage above and beyond the generally accepted standards of care with respect to mental health and substance use disorder benefits, compared to the impact on coverage the facially neutral 24/7 onsite nursing requirement has on skilled nursing facilities. The same requirement drastically limits coverage for the former while minimally impacting coverage of the latter. This states a MHPAEA violation under the framework *Ryan S.* provided.

Plaintiffs pled facts supporting their alleged disparity by arguing that 24/7 onsite nursing is not medically necessary for residential treatment facilities and also does not reflect the generally accepted standards of care for residential treatment facilities. By contrast, 24/7 onsite nursing *is* medically necessary and also reflects the generally accepted standard of care for skilled nursing facilities. Accordingly, Plaintiffs pled that the Plan's facially neutral "24/7 onsite nursing" staffing requirement imposes a more stringent limit on residential treatment facilities because it imposes staffing requirements on residential mental health treatment above and beyond what is medically necessary and generally accepted for mental health, but imposes staffing requirements on analogous skilled nursing treatment that match what is medically necessary and generally accepted for medical/surgical care.

The concept that facially neutral Plan terms can violate MHPAEA in application is not controversial – it is supported by both federal regulations and case law. For example, 29 C.F.R. 2590.712(c)(4)(i) provides that ERISA plans and administrators violate MHPAEA if "the terms of the plan … as written" impose more stringent limits on mental health or substance use disorder care than on analogous medical/surgical care. However, it also provides that ERISA plans and administrators violate MHPAEA if "the terms of the plan … in operation" impose "processes, strategies, evidentiary standards, or other factors" such that "*applying*"

a treatment limitation to mental health or substance use disorder treatment *results in* a more stringent limit on coverage for that treatment than the limitation applying that term places on analogous medical/surgical care. *Id.* (emphasis added).

The Ninth Circuit and other courts have taken to calling facially neutral plan terms that result in more stringent treatment limitations in operation "as-applied" MHPAEA violations. *See* 98 F.4th at 971 (recognizing "as-applied" cases as a type of potential MHPAEA violation); *see also C.M. v. Health Care Serv. Corp.,* 2025 U.S. Dist. LEXIS 57306, *7 (N.D. Ill. March 27, 2025) (observing that courts "recognize 'facial' challenges as well as 'as-applied' challenges under [MHPAEA]" and noting that "[t]he Seventh Circuit has not yet articulated a clear pleading standard for either"), *Smith v. Golden Rule Ins. Co.*, 526 F. Supp. 3d 374, 386-90 (S.D. Ind. 2021) (denying a motion to dismiss on the basis that facially neutral plan terms and administrator policies can still give rise to a MHPAEA claim if their application limits access to mental health care), *M.S. v. Premera Blue Cross*, 553 F. Supp. 3d 1000, 1028-29 (D. Utah 2021) (observing that "as applied" challenges can appropriately target the impact of ERISA administrators' policies and procedures (overruled on other grounds by *M.S. v. Premera Blue Cross*, 118 F.4th 1248 (10th Cir. 2024)); *compare Midthun-Hensen v. Group Health Coop. of S. Cent. Wis., Inc.*, 672 F. Supp. 3d 662, 678 (W.D. Wis. 2023) (observing that MHPAEA "prohibits the imposition of more stringent treatment limitations for

mental health treatment than for medical treatment" and acknowledging that as-applied challenges can state valid claims (citation and internal quotation marks omitted)).

It is clear that a facially neutral Plan restriction imposed across the board in a way that results in a more stringent limitation on coverage for mental health or substance use disorder treatment than on coverage for analogous medical/surgical treatment violates MHPAEA. Plaintiffs turn to explaining how their Amended Complaint conformed with the appropriate pleading standards to articulate that sort of claim.

In *E.W.*, the Tenth Circuit found that to assert a valid MHPAEA claim, a Plaintiff must:

> (1) plausibly allege that the relevant group health plan is subject to MHPAEA;
>
> (2) identify a specific treatment limitation on mental health or substance-use disorder benefits covered by the plan;
>
> (3) identify medical or surgical care covered by the plan that is analogous to the mental health or substance-use disorder care for which the plaintiffs seek benefits; and
>
> (4) plausibly allege a disparity between the treatment limitation on mental health or substance-use disorder benefits as compared to the limitations that defendants would apply to the medical or surgical analog.

86 F.4th at 1283.

Applying the *E.W.* framework to the case at hand, the Plaintiffs do not believe that the first *E.W.* element, that the Plan is subject to MHPAEA, is disputed by the parties. *See* Amended Complaint, ECF Doc. No. 55 ¶¶ 36-38. To meet the second *E.W.* element, Plaintiffs identified "a specific treatment limitation on mental health or substance-use disorder benefits covered by the plan[:]"in this case, the Plan's requirement that residential treatment centers afford 24-hour onsite nursing supervision, which "is more restrictive than generally accepted standards of medical practice" for residential treatment centers. *See* ECF Doc. No. 55 ¶¶ 75-78.

To meet the third *E.W.* element, Plaintiffs alleged that skilled nursing facilities are an appropriate medical/surgical analogue for residential treatment. *See* ECF Doc. No. 55 ¶¶ 42-45. The Defendants' motions to dismiss make clear they do not dispute this. *See generally* ECF Doc. Nos. 70 and 71.

To meet the fourth *E.W.* element, Plaintiffs alleged that "[when evaluating whether to provide coverage for skilled nursing facilities, BCBSIL is guided by generally accepted standards of care" and "does not impose requirements for coverage that deviate from, or impose more stringent requirements above and beyond, generally accepted standards of care for skilled nursing facilities." ECF Doc. No. 55 ¶ 79. This contrasts with their treatment of residential treatment facilities, where Defendants do "place[ ] a condition for coverage … that is more

restrictive than generally accepted standards of medical practice." ECF Doc. No. 55 ¶ 78. As the district court observed, Plaintiffs also argued the 24/7 onsite nursing is medically necessary for skilled nursing facilities but is not medically necessary for residential treatment facilities. *See* ECF Doc. No. 79 at 6-7.

This was sufficient to allege a disparity in the way Defendants cover residential treatment facilities (departing from the generally accepted standards of medical practice and imposing medically unnecessary staffing requirements) compared to the way Defendants cover analogous skilled nursing facilities (with no departure from the generally accepted standards of medical practice and no medically unnecessary staffing requirements). Accordingly, the district court erred when it found Plaintiffs had not adequately pled that Defendants violated MHPAEA. Similarly, the district court also erred when it concluded that Plaintiffs three other alleged MHPAEA violations were pled inadequately, because those violations flow from the same logic as the 24/7 onsite nursing violation.

In this case, the Seventh Circuit has the opportunity to correct the district court's error and articulate a pleading standard that allows ERISA plan participants and beneficiaries to challenge facially neutral Plan exclusions that result in more stringent limitations on mental health or substance abuse coverage once they are applied. Plaintiffs ask that the Court do so and reverse the district court's dismissal of Plaintiffs' claims.

## III.   DEFENDANTS AND THE COURT IMPROPERLY RELIED ON FACTUAL FINDINGS INAPPROPRIATE AT THE MOTION TO DISMISS STAGE.

In this case, the Defendants consistently invited the district court to decide on the merits of the case that the disparities alleged by the Plaintiffs either are not actually disparities or that the Defendants were justified in creating such a disparity. This can be seen, for example, in BCBSIL arguing that the Court should disregard expert testimony that Plaintiffs alleged the existence of and offered, *see* ECF Doc. No. 62, at 9, n.6, Defendants' invitation for the district court to find as a matter of fact that AACAP articulates *the* "generally accepted standard[] of medical practice[,]" *see id*, at 12, or Defendants' argument that the district court should find that "the Plan treats SNFs comparably." *See id*, at 11. These arguments are and were misplaced in a motion to dismiss. Instead, applying the test articulated in the *E.W.* and *Ryan S.* cases, the Court should have evaluated whether Plaintiffs sufficiently pled Defendants' MHPAEA violations under the Fed. R. Civ. P. 12(b)(6) standard. Had it done so, the district court would have found that Plaintiffs articulated plausible theories of MHPAEA liability in the Amended Complaint. Especially when Plaintiffs allege the existence of factual material in the form of expert testimony proving their claims, the allegations more than plausibly state a claim. *See Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018).

Instead, in its ruling, the district court rejected Plaintiffs' well-founded argument and allegations relating to the generally accepted standards of care, relying in part on factual findings made at the motion to dismiss stage to justify its decision. *See, e.g.,* ECF Doc. No. 79, at 2-3. This constitutes a reversible error.

## IV. DISMISSAL OF PLAINTIFFS' SECOND CAUSE OF ACTION WAS ALSO INAPPROPRIATE.

Plaintiffs' second cause of action contends that Defendants wrongfully denied C.B.'s claims for benefits under the terms of the Plan. Even the district court acknowledged that absent the alleged disparity inherent in Plaintiffs' MHPAEA claim, R.B.'s care was "*needed and properly received*." *See* ECF Doc. No. 79, at 8 (emphasis in original). The district court acknowledged that its dismissal of Plaintiffs' second cause of action was entirely dependent on dismissal of the MHPAEA claim. *See id*. Plaintiffs agree, and because Plaintiffs' MHPAEA claim survives, so too should the claim for benefits.

Other courts in this Circuit have, in virtually identical circumstances, noted that when a plaintiff claims the terms of their insurance plan violate MHPAEA, and an ERISA administrator's sole reason for denying the claim for benefits is predicated on the ostensibly invalid terms of the Plan, Defendants' arguments for dismissal rest on the assumption that there is no Parity Act violation and dismissal is inappropriate. *See, e.g., Brian W. v. Health Care Serv. Corp.*, 2025 U.S. Dist. LEXIS 13773, at *5 (N.D. Ill. Jan. 27, 2025) (citing *REI Transp., Inc. v. C.H.*

*Robinson Worldwide, Inc.*, 519 F.3d 693, 699 (7th Cir. 2008) to assert that "[i]f a provision of a contract violates a statute… that provision is void."); *see also C.M. v. Health Care Serv. Corp.*, 2025 U.S. Dist. LEXIS 57306, at *22 (N.D. Ill. Mar. 27, 2025) (same). The Ninth Circuit has similarly found that plans and administrators are precluded from deicding if coverage applies when an alleged MHPAEA violation could affect the decision to award benefits, as is the case here. *See Danny P. v. Catholic Health Initiatives*, 891 F.3d 1155, 1158 (9th Cir. 2018).

Here, Plaintiffs pled their claims for wrongful denial of benefits because they alleged their claims were denied by and through plan terms that violate MHPAEA. Because dismissal of Plaintiffs' MHPAEA claims was erroneous, the benefits claim should also be resurrected.

## CONCLUSION

For the foregoing reasons, Plaintiffs ask the Court to reverse the district court's dismissal for Plaintiffs' MHPAEA cause of action. Because Plaintiffs' claim for wrongful denial of benefits is predicated on their MHPAEA claim, Plaintiffs also ask that the Court reverse that claim as well.

DATED this 20th day of August, 2025.


/s/ Brian S. King
Attorney for Plaintiffs-Appellants

## STATEMENT WHY ORAL ARGUMENT IS NECESSARY

Plaintiffs present the following statement why oral argument is necessary:

Plaintiffs request the opportunity to present oral argument. This case involves the inner workings of MHPAEA, a complex statute that creates causes of action that are rarely pled. To the best of C.B.'s knowledge, these matters have not been directly addressed by the Seventh Circuit and are of significant importance as several million individuals in the Circuit receive employee welfare benefits under insurance plans subject to MHPAEA. This Court's decision will impact all these individuals.

DATED this 20th day of August, 2025.

/s/ Brian S. King
Attorney for Appellants

**CERTIFICATE OF COMPLIANCE WITH FRAP RULE 32(a)(7), FRAP RULE 32(g), AND CR 32(c)**

1. This document complies with the type volume limitation of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 4,943 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word for Mac (Version 16.88) using 14-point Times New Roman type.

DATED this 20th day of August, 2024.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served to all parties registered to receive notices via the Court's CM/ECF system. Two copies of the Brief and Required Short Appendix of Appellant and as well as a digital version containing the brief were delivered by CM/ECF to counsel for the Defendants-Appellees, Blue Cross and Blue Shield of Illinois and the Mondolez Global LLC Group Benefits Plan.

DATED this 20th day of August, 2025.

/s/ Brian S. King

## CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), counsel certifies that all material required by Circuit Rule 30(a) and (b) are included in the appendix.

DATED this 20th day of August, 2025.

/s/ Brian S. King

No. 25-1323

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH

_____

C.B., INDIVIDUALLY AND ON BEHALF OF R.B., A MINOR

*Plaintiffs - Appellant* s

v.

BLUE CROSS AND BLUE SHIELD OF ILLINOIS AND MONDOLEZ GLOBAL LLC GROUP
BENEFITS PLAN

*Defendants, Appellees.*

_____

On appeal from the United States District Court for the Northern District of
Illinois, Eastern Division, Case No. 23-cv-01206
The Honorable Mary M. Rowland

_____

**PLAINTIFFS APPENDIX**

*ORAL ARGUMENT REQUESTED*

_____

Brian S. King, Utah Bar No. 4610
BRIAN S. KING P.C.
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: 801-532-1739
Facsimile: 801-532-1936
brian@briansking.com

*Counsel for Appellants C.B. and R.B.*

00001

| Description of Document | ECF No. | Pages of Appendix |
|---|---|---|
| Decision and Order Granting Motion to Dismiss | 79 | 3-10 |
| Amended Complaint | 55 | 11-21 |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| C.B. and R.B., | |
| Plaintiffs, | |
| v. | Case No. 23-cv-01206 |
| | Judge Mary M. Rowland |
| BLUECROSS BLUESHIELD of ILLIONIS and the MONDOLEZ GLOBAL LLC GROUP BENEFITS PLAN, | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff C.B., individually and on behalf of R.B., brings this Employee Retirement Income and Security Act ("ERISA") action against Defendants Blue Cross Blue Shield of Illinois ("BCBSIL") and Mondelez Global LLC Group Benefits Plan (the "Plan," and collectively, "Defendants"). Plaintiffs allege in their amended complaint that Defendants wrongly denied coverage for mental health treatment in violation of the Mental Health Parity and Addiction Equity Act of 2008 (the "Parity Act"). For the reasons stated herein, Defendants' motions to dismiss [61]; [63] are granted.

### I.    Background

The Plan is a self-funded employee welfare benefits plan under ERISA, and BCBSIL is an independent licensee of the Blue Cross and Blue Shield network of providers and the fiduciary under ERISA for the Plan. [55] ¶¶ 2, 3. C.B. is a

1

participant in the Plan and R.B. was a beneficiary during time of the events that gave rise to this litigation. [55] ¶ 4.

R.B. has a history of severe anxiety, depression, suicidal thoughts, and aggressive behaviors. [55] ¶ 11. R.B. received treatment at Triumph Youth Services ("Triumph"), a licensed residential treatment center ("RTC") located in Box Elder County, Utah. [55] ¶¶ 5, 6. BCBSIL denied claims for payment of R.B.'s medical expenses at Triumph and C.B. appealed the denial. [55] ¶¶ 12-13. BCBSIL denied the appeal because the Plan only covered treatment at RTCs as they are defined in the Plan, and the Plan's definition of an RTC requires there to be "24 hour medical availability and 24 hour onsite nursing service for patient[s] with Mental Illness and/or Substance Use Disorders." *See* [55] ¶ 32. Because Triumph did not require a 24-hour onsite nursing presence, BCBSIL claimed denial was appropriate.

Plaintiffs filed their original complaint (the "Original Complaint") on October 21, 2022, alleging that Defendants violated the Parity Act by imposing a non-quantitative treatment limitation ("NQTL")—specifically, the 24-hour onsite nursing presence requirement—on mental health benefits that are not imposed on analogous medical benefits. [2]. Defendants filed motions to dismiss [33]; [34], and in their briefing on the motions, Plaintiffs conceded that the medical benefits that are analogous to RTCs are Skilled Nursing Facilities ("SNFs"), and that SNFs also require 24-hour onsite nursing presence. [41] at 1. Plaintiffs nonetheless argued that the Plan's 24-hour requirement was not a part of the generally accepted standard of care ("GASC") for RTCs. [41] at 9-10. However, this Court found that the GASC set

2

out in the in the American Academy of Child and Adolescent Psychiatrists' "Principles of Care for Treatment of Children and Adolescents with Mental Illnesses in Residential Treatment Centers" concluded that one GASC for RTCs is that an RTC have either a "registered nurse with at least one year experience in mental health services or a mental health worker" who "should provide 24 hour developmentally sensitive child supervision, leisure and supportive care." [54] at 3. This Court dismissed Plaintiffs' Original Complaint without prejudice because Plaintiffs failed to plausibly allege that the differences between the Plan's requirements for RTCs and SNFs violated the Parity Act.

In their amended complaint, Plaintiffs bring two counts. In Count I, Plaintiffs allege that Defendants violated the Parity Act in four distinct but similar ways: (i) by imposing treatment limitations on RTCs that are unnecessary for mental health treatment but not imposing treatment limitations on SNFs that are unnecessary for medical/surgical treatment, (ii) by imposing treatment limitations on RTCs that go beyond medical necessity while imposing only medically necessary treatment limitations on SNFs, (iii) by denying claims at duly licensed RTCs while accepting claims substantially all duly licensed SNFs, and (iv) imposing treatment limitations on RTCs that exceed the GASC for RTC while only imposing treatment limitations on SNFs that do not exceed the GASC for SNFs. [55] ¶¶ 47 – 79. In Count II, Plaintiffs seek a judgment in the amount of medically necessary services that R.B. obtained at Triumph and that the Plan would have covered if not for the alleged Parity Act violations. [55] ¶¶ 82 – 91.

3

## II.    Standard

"To survive a motion to dismiss under Rule 12(b)(6), the complaint must provide enough factual information to state a claim to relief that is plausible on its face and raise a right to relief above the speculative level." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018) (quoting *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014)); *see also* Fed. R. Civ. P. 8(a)(2) (requiring a complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief"). A court deciding a Rule 12(b)(6) motion "construe[s] the complaint in the light most favorable to the plaintiff, accept[s] all well-pleaded facts as true, and draw[s] all reasonable inferences in the plaintiff's favor." *Lax*, 20 F.4th at 1181. However, the court need not accept as true "statements of law or unsupported conclusory factual allegations." *Id.* (quoting *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 586 (7th Cir. 2021)). "While detailed factual allegations are not necessary to survive a motion to dismiss, [the standard] does require 'more than mere labels and conclusions or a formulaic recitation of the elements of a cause of action to be considered adequate.'" *Sevugan v. Direct Energy Servs., LLC*, 931 F.3d 610, 614 (7th Cir. 2019) (quoting *Bell v. City of Chicago*, 835 F.3d 736, 738 (7th Cir. 2016)).

Dismissal for failure to state a claim is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007). Deciding the plausibility of the claim is "a context-specific task that requires the reviewing court to draw on its judicial

4

experience and common sense." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

## III. Analysis

The Parity Act requires that any limitations on "mental health or substance use disorder benefits" (hereinafter, "MH/SUD") in an ERISA plan be "no more restrictive than the predominant treatment limitations applied to substantially all [covered] medical and surgical benefits." 29 U.S.C. § 1185a(a)(3)(A)(ii). Thus, to succeed on a claim under the Parity Act, a plaintiff must show that an ERISA plan that offers both medical/surgical benefits and mental health benefits imposed a more restrictive limitation on mental health/substance use disorder MH/SUD treatment than limitations on treatment for medical and surgical issues. *See Stone v. UnitedHealthcare Ins. Co.*, 979 F.3d 770, 774 (9th Cir. 2020).

As other courts have recognized, "there is no clear law on how to state a claim for a Parity Act violation." *Michael W. v. United Behavioral Health*, 420 F. Supp. 3d 1207, 1234 (D. Utah 2019). Plaintiffs urge the court to adopt the test used by either the Ninth Circuit or Tenth Circuit. The Ninth Circuit held in *Ryan S.* that it is sufficient to state a claim under the Parity Act when a plaintiff alleges that an ERISA plan applies "a more stringent review process" to MH/SUD claims than to medical/surgical claims. *Ryan S. v. UnitedHealth Grp., Inc.*, 98 F.4th 965, 969 (9th Cir. 2024). Similarly, in *E.W.*, the Tenth Circuit held that it is sufficient to "plausibly allege a disparity between the treatment limitation on [MH/SUD] benefits as compared to the limitations that defendants would apply to the medical or surgical analog." *E.W. v.*

5

*Health Net Life Ins. Co.*, 86 F.4th 1265, 1283 (10th Cir. 2023). Under either of these tests, however, Plaintiffs have failed to state a claim.

The problem for Plaintiffs is that Defendants apply the same treatment limitation—a 24-hour nursing presence requirement—to both RTCs and their medical/surgical analog, SNFs.[1] Plaintiffs argue that because the Plan's definition of RTCs explicitly requires a 24-hour nursing presence while the Plan's definition of SNFs does not, the Plan contains a disparate treatment limitation. But the Plan provides that it will only cover SNFs that are "certified in accordance with the guidelines established by Medicare." [64-1] at 32. And the relevant Medicare regulations require a 24-hour nursing presence for SNFs. *See* 42 U.S.C. § 1395i-3(b)(4)(C)(i). Thus, the Plan imposes the same 24-hour requirement on both RTCs and SNFs. There is "no disparity between the treatment limitation imposed [MH/SUD] benefits as compared to the limitations that defendants would apply on the medical or surgical analog." *E.W.*, 86 F.4th 1265 at 1283.

Plaintiffs also argue that Defendants apply "more stringent internal processes" to RTCs than SNFs, as contemplated by the *Ryan S.* test. Plaintiffs suggest that the 24-hour requirement is a more stringent internal process because the 24-hour nursing requirement is medically necessary at SNFs but goes beyond what is medically necessary at RTCs. They also argue that the plan imposes extra licensure

---

[1] Plaintiffs concede that SNFs are the medical/surgical analog to RTCs. *See* [55] ¶ 24. The relevant federal regulations likewise identify SNFs and RTCs as analogous. 78 Fed. Reg. 68247. Plaintiffs also suggest intermittently in their amended complaint that Inpatient Rehabilitation Facilities ("IRFs") are the appropriate analogue. *See* [55] ¶¶ 35, 44. But, like SNFs, the relevant regulations require that IRFs also maintain a 24-hour nursing presence. *See* 42 U.S.C. §§ 1395x(e)(1)-(5) (explaining that an institution that provides rehabilitation services is a hospital, and that hospitals are required to provide 24-hour nursing services).

6

requirements on RTCs that are not imposed on SNFs, and that the 24-hour requirement exceeds GASC for RTCs but not for SNFs. But the *Ryan S.* court's reference to an "internal review process" referred to the review process that an insurer undertakes in reviewing specific claims, not the kind of categorical process by which the Plan defines RTCs and SNFs that Plaintiffs take issue with here. *See Ryan S.*, 98 F.4th at 973. Plaintiffs' allegations regarding GASCs and medical necessity are of another matter entirely than what the court in *Ryan S.* contemplated.

But even if the Court adopted a broader view of an "internal review process," Plaintiffs' Parity Act claim would still fail because the relevant treatment limitation is equally applied for RTCs and SNFs. Plaintiffs take issue with the fact that the Plan applies the *same* treatment limitation on RTCs and SNFs, not that the Plan applies *different* treatment limitations. Plaintiffs may well be right that, for example, the 24-hour nursing requirement is medically necessary for SNFs but not for RTCs, or that the requirement goes beyond RTCs' GASCs, but the fact that the Plan applies the treatment limitation to both analogues equally precludes Plaintiffs from stating a Parity Act violation. *See* 29 C.F.R. § 2590.712(c)(2)(ii)(C)(2) (a treatment limitation applied equally to medical/surgical benefits and MH/SUD does not violate the Parity Act). As for the Plan's licensing requirements, there is no requirement in the Parity Act that ERISA plans do not place higher standards on treatment centers than those required by state licensing as long as the standards are applied equally. *See L.P. v. BCBSM, Inc.*, No. 18-cv-1241, 2020 WL 981186, at *7 (D. Minn. Jan. 17, 2020). These allegations are insufficient to state a Parity Act claim.

7

The Court is deeply frustrated with the limits of the Parity Act in this regard. R.B. suffered from mental health issues that required care at the level provided at an RTC. According to the facts alleged in the complaint, Defendants initially communicated to Plaintiffs that R.B.'s care would be covered because of an internal error. [55] ¶¶ 11, 14. Plaintiffs then incurred medical expenses totaling more than $165,000 to obtain what may have been lifesaving care for R.B. [55] ¶ 34. This sequence of events is very troubling. As it stands now, the Parity Act, despite its goal of requiring insurance companies to cover care for mental health, leaves plaintiffs like R.B. unable to state a claim *for the care he needed and properly received* for his mental health challenges. Because Plaintiffs' second count is dependent on their Parity Act claim surviving, *see* [55] ¶82, that claim fails too.

## IV. Conclusion

For the stated reasons, Defendants' Motion to Dismiss [61]; [63] is granted.

E N T E R:

Dated: February 18, 2025

_____
MARY M. ROWLAND
United States District Judge

8

00010

Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiff

THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| C.B. and R.B. | AMENDED COMPLAINT |
| Plaintiffs, | |
| vs. | Case No. 23-cv-01206 |
| BLUECROSS BLUESHIELD of ILLINOIS, and the MONDOLEZ GLOBAL LLC GROUP BENEFITS PLAN. | Judge Mary M. Rowland |
| Defendants. | |

Plaintiffs C.B., and R.B., through their undersigned counsel, complain and allege against

Defendants BlueCross BlueShield of Illinois ("BCBSIL"), and the Mondelez Global LLC Group

Benefits Plan ("the Plan") as follows:

**PARTIES, JURISDICTION AND VENUE**

1.  C.B. and R.B. are natural persons residing in Union County, New Jersey. C.B. is R.B.'s

    mother.

00011

2. BCBSIL is an independent licensee of the nationwide Blue Cross and Blue Shield network of providers and was the third-party claims administrator, as well as the fiduciary under ERISA for the Plan during the treatment at issue in this case.

3. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA").

4. C.B. was a participant in the Plan and R.B. was a beneficiary of the Plan at all relevant times. C.B. and R.B. continue to be participants and beneficiaries of the Plan.

5. R.B. received medical care and treatment at Triumph Youth Services ("Triumph") from October 22, 2019, to September 9, 2020.

6. Triumph is a licensed residential treatment facility located in Box Elder County, Utah, which provides sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

7. BCBSIL denied claims for payment of R.B.'s medical expenses in connection with his treatment at Triumph.

8. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

9. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because BCBSIL does business in Illinois, and because this case was transferred from Utah to the Northern District of Illinois by ECF 22.

10. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants'

violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"),
an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29
U.S.C. §1132(g).

## BACKGROUND FACTS

### Triumph

11. R.B. was admitted to Triumph on October 22, 2019, due to a history of severe anxiety
and depression, suicidal thoughts, and aggressive behaviors which had not been able to
be resolved at other levels of care. The first four days of treatment were initially
authorized by BCBSIL (although incorrectly labeled as acute) in a letter dated October
29, 2019.

12. In a series of explanation of benefits ("EOB") statements, BCBSIL denied payment for
R.B.'s treatment under the following denial codes:

> 273: Service not covered by contract for this type of provider.

> 273: Services performed were not within the scope of the provider's practice,
> license or applicable medical standards guidelines.

> 360: Claim denied based on information provided. Complete medical records
> should be provided for reconsideration of this claim.

> 360: Additional information has been requested to complete the processing of this
> claim. Consideration of this claim cannot be made until this information is
> received.

> 736: Room and board charges not covered for days not approved by the Medical
> Services Advisor. Provider does not participate in the Community Blue/Preferred
> Ancillary Network (PAN). Patient is responsible for payment of these charges.

> 411: Charge exceeds Usual and Customary. Amount is provider write-off for
> participating providers; refer to the Fee Schedule for pricing allowance.

13. On December 11, 2020, C.B. submitted an appeal for the denial of payment for R.B.'s treatment from his admission on October 22, 2019, through his discharge on September 9, 2020.

14. C.B. stated that the first few days of R.B.'s treatment had initially been approved by BCBSIL but had mistakenly been classified as an acute inpatient level of care. She stated that this error was eventually resolved but BCBSIL continued to deny payment due to factors such as a lack of nursing staff on site 24 hours a day, 7 days a week. C.B. argued that this requirement was also an acute level requirement and should not have been imposed on R.B.'s residential treatment care.

15. She reminded BCBSIL that she was entitled to certain protections under ERISA, including a full, fair, and thorough review using appropriately qualified reviewers which considered all the information she provided, gave her the specific reason(s) for the adverse determination, referenced the specific plan provisions on which the denial was based, and gave her the information necessary to perfect the claim.

16. She asked that the reviewer have experience with MHPAEA and also asked to be provided with a physical copy of all documentation related to the appeal decision and the initial denial EOB's including any internal case notes or reports.

17. C.B. noted that she had not been provided with a consistent denial rationale and had been offered multiple justifications for the denial of payment.

18. She stated that it seemed BCBSIL was improperly stacking denial rationales in an attempt to "hedge their bets" and to obscure the true justification for the denial. She stated that this made it exceptionally difficult to effectively appeal the denials and to properly advocate on her son's behalf.

19. She argued that coverage was available for R.B.'s treatment under the terms of the Plan and pointed out that as a licensed residential treatment center, Triumph met the Plan's definition of a "Provider" and R.B.'s treatment at Triumph should have been approved on that basis alone.

20. C.B. wrote that because some of the denial EOB's she received requested additional records, she attached an updated copy of R.B.'s medical records with the appeal. These records documented instances such as R.B. self-harming with a pair of scissors while in treatment or threatening to run away from the program.

21. She stated that she had also been told in EOB's that the services at Triumph were not within the "scope of the provider's practice, license or applicable medical standards guidelines." She contended that this assertion was false and noted that Triumph was licensed by the State of Utah to provide residential treatment services to adolescents and was compliant with all applicable governing state regulations.

22. C.B. stated that she had also received a verbal denial which stated that coverage had been denied due to a lack of 24/7 onsite nursing care. She contended that this requirement was overly restrictive and pointed out that the State of Utah did not require this for residential treatment centers. She wrote that this requirement likely constituted a non-quantitative treatment limitation in violation of MHPAEA.

23. C.B. stated that MHPAEA compelled insurers to offer benefits for mental health benefits "at parity" with analogous medical or surgical benefits. C.B. identified skilled nursing, hospice, and inpatient rehabilitation facilities as some of the medical or surgical analogues to the treatment R.B. received.

00015

24. She included a table with the information below to provide evidence of the disparate requirements applied to residential treatment compared to its medical/surgical analogues.

| Facility Type | License | Scope of License | 24-hour Nursing | Credentialed | Accredited |
|---|---|---|---|---|---|
| Residential Treatment | Yes | Yes | Yes | Yes | Yes |
| Skilled Nursing | Yes | Yes | No | No | No |
| Long-term Care | No | No | No | No | No |
| Hospice | Yes | Yes | No | No | No |
| Rehabilitation | No | No | No | No | No |

25. C.B. argued that on their face, the requirements applied to residential treatment facilities were stricter than those imposed on analogous medical or surgical services. She pointed out that while residential treatment centers had to meet all five of these requirements, only skilled nursing and hospice care were required to meet any of them, and in that case they were required to satisfy only two requirements related to licensure while additional requirements such as accreditation and 24 hour onsite nursing care were specifically applied only to residential treatment facilities.

26. She argued that the Plan applied restrictions to residential treatment care, including restrictions on medical management standards as well as restrictions based on geographic location, facility type, provider specialty, and other criteria which it did not equally apply to analogous medical or surgical services.

27. C.B. wrote that she was entitled to relief under MHPAEA as she had demonstrated that the Plan was subject to MHPAEA, that the Plan offered both medical/surgical benefits as well as mental health/substance use benefits, that the appropriate analogues to R.B.'s residential treatment included skilled nursing, rehabilitation, and hospice facilities, and

00016

that the requirements imposed on R.B.'s residential treatment were more restrictive than those imposed on analogous medical or surgical services.

28. She asked BCBSIL to conduct a parity compliance analysis on the terms of the Plan and directed it to provide her with physical copies of any documentation used in this analysis.

29. She asked BCBSIL to directly respond to all the issues she had raised during the appeals process and if denial was maintained to directly address why BCBSIL concluded it had not violated MHPAEA.

30. In the event the denial was upheld she also asked to be provided with a copy of all documents under which the Plan was operated, including all governing plan documents, the summary plan description, any insurance policies in place for the benefits she was seeking, any administrative service agreements that existed, any clinical guidelines or medical necessity criteria utilized in the determination, as well as their medical or surgical equivalents (whether or not these were used to evaluate the claim), as well as reports and opinions of any physician or other professional who evaluated the claim, as well as their the names, qualifications, and denial rates. (collectively the "Plan Documents")

31. C.B. requested that in the event BCBSIL was not in possession of these documents or was not acting on behalf of the Plan Administrator in this regard that it forward her request to the appropriate entity.

32. In a letter dated January 15, 2021, BCBSIL upheld the denial of payment for R.B.'s treatment. The letter gave the following justification for the denial:

> The claim for dates of service October 22, 2019 - October 25, 2019, 93105549C560H 2,200.00 was processed at the out of network benefit level and applied towards the out of pocket maximum. The claim for dates of services October 26, 2019 – October 31, 2019, 93105550C780H 3,300 was also processed

at the out of network benefit level (411- Charge exceeds Usual and Customary). There was approval initially for October 22, 2019 - October 25, 2019 4 days. A correction was made and the services were not approved due to the facility does not meet the definition of a residential treatment [sic] with confirmation of 24 hour nursing presence and M.D. access is required.

The claims for dates of services November 1, 2019 - May 31, 2020 and September 1, 2020 - September 9, 2020 denied 273 - Services are not covered by contract for this type of provider. The services are not covered due to the facility does not meet the definition of a residential treatment [sic] with confirmation of 24-hour nursing presence and M.D. access is required [sic].

The claims for June 1, 2020 - June 30, 2020 021855939Y60H 16,500.00 July 1, 2020 - July 31, 2020 0202021855938Y70H 17,050.00 and August 1, 2020 - August 31, 2020 026055157D70H 17,050.00 were denied 360- Medical records required. Medical records were received and reviewed. The claims were not adjusted with the correct denial after records were reviewed. These claims will be adjusted to deny 273- Services are not covered by contract for this type of provider. The services are not covered due to the facility does not meet the definition of a residential treatment [sic] with confirmation of 24-hour nursing presence and M.D. access is required [sic].

Based on the provisions, we have determined that the claims have been correctly processed according to the billing information and benefit provisions for this plan. At this time, no additional reimbursement is available.

We regret our outcome could not be more favorable. …
Please refer to the "DEFINITIONS" section which explains:

RESIDENTIAL TREATMENT CENTER… means a facility setting offering a defined course of therapeutic intervention and special programming in a controlled environment which also offers a degree of security, supervision. structure and is licensed by the appropriate state and local authority to provide such service. It does not include halfway houses, supervised living, group homes, wilderness programs, boarding houses or other facilities that provide primarily a supportive environment and address long-term social needs, even if counseling is provided in such facilities. Patients are medically monitored with 24 hour medical availability and 24 hour onsite nursing service for patient with Mental Illness and/or Substance Use Disorders. Any Mental Illness and/or Substance Use Disorder Residential Treatment Center must be licensed in the state where it is located, or accredited by a national organization that is recognized by the Claim Administrator as set forth in its current credentialing policy, and otherwise meets all other credentialing requirements set forth in such policy."

Also, please refer to the "EXCLUSIONS - WHAT IS NOT COVERED" section, which explains:

> ---Behavioral health services provided at behavioral modification facilities, boot camps, emotional group academies, military schools, therapeutic boarding schools, wilderness programs, halfway houses, and group homes, except for Covered Services provided by appropriate Providers as defined in this benefit booklet. (emphasis in original)

33. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

34. The denial of benefits for R.B.'s treatment was a breach of contract and caused C.B. to incur medical expenses that should have been paid by the Plan in an amount totaling over $165,000.

35. BCBSIL failed to produce a copy of the Plan Documents including any medical necessity criteria for mental health and substance use disorder treatment and for skilled nursing or rehabilitation facilities in spite of C.B.'s request.

## FIRST CAUSE OF ACTION

### (Claims for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

36. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA.

37. The obligation to comply with both ERISA and MHPAEA is part of BCBSIL's fiduciary duties.

38. This Plan is governed by and subject to MHPAEA.

39. MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

40. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant

00019

treatment limitations applied to substantially all medical and surgical benefits and also
makes illegal separate treatment limitations that are applicable only with respect to
mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

41. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not
limited to, medical management standards limiting or excluding benefits based on
medical necessity; refusal to pay for higher-cost treatment until it can be shown that a
lower-cost treatment is not effective; and restrictions based on geographic location,
facility type, provider specialty, or other criteria that limit the scope or duration of
benefits for mental health or substance use disorder treatment. 29 C.F.R.
§2590.712(c)(4)(ii)(A), (F), and (H).

42. For purposes of MHPAEA compliance analysis, mental health and substance use
disorder treatment must be compared to analogous medical/surgical treatment and
reviewed to evaluate whether the Plan's treatment limitations for mental health and
substance use disorders are more restrictive than the treatment limitations for their
medical/surgical analogs for purposes of receiving benefits under the Plan.

43. Under MHPAEA's Final Rules, residential treatment centers, as sub-acute, intermediate
inpatient forms of mental health/substance use disorder treatment, are appropriately
analogized to sub-acute, intermediate inpatient medical/surgical facilities.

44. Medical/surgical treatment analogs of the same classification include skilled nursing
facilities and intermediate inpatient rehabilitation facilities or habilitative services.

45. These medical/surgical analogs of the same classification provide less intensive care than
what is provided by a hospital, but more intensive than what is provided by outpatient
treatment.

46. Residential treatment centers such as Triumph provide treatment for mental health and substance use disorders that is less intensive than treatment provided in psychiatric hospitals, but more intensive than what is provided by partial hospitalization or intensive outpatient programs.

**MHPAEA Violation #1: The Facility Definitions of the Plan Impose a More Restrictive Treatment Limitation on Residential Treatment Centers than they Impose on Skilled Nursing Facilities.**

47. The Plan states a "SKILLED NURSING FACILITY.....means an institution or a distinct part of an institution which is primarily engaged in providing comprehensive skilled services and rehabilitative Inpatient care and is duly licensed by the appropriate governmental authority to provide such services, and operating within the scope of such license." (emphasis in original)

48. The Plan states: RESIDENTIAL TREATMENT CENTER......means a facility setting offering a defined course of therapeutic intervention and special programming in a controlled environment which also offers a degree of security, supervision, structure and is licensed by the appropriate state and local authority to provide such service. It does not include halfway houses, supervised living, group homes, wilderness programs, boarding houses or other facilities that provide primarily a supportive environment and address long-term social needs, even if counseling is provided in such facilities. Patients are medically monitored with 24 hour medical availability and 24 hour onsite nursing service for patients with Mental Illness and/or Substance Use Disorders. Any Mental Illness and/or Substance Use Disorder Residential Treatment Center must be licensed in the state where it is located, or accredited by a national organization that is recognized by the

11

00021

Claim Administrator as set forth in its current credentialing policy, and otherwise meets all other credentialing requirements set forth in such policy.

49. A comparison of these definitions on the face of the Plan documents reveals a disparity between residential treatment centers and skilled nursing facilities.

50. The following language is MHPAEA compliant if the Plan used the skilled nursing facility definition as its model:

| SKILLED NURSING FACILITY | RESIDENTIAL TREATMENT CENTER |
|---|---|
| means an institution or a distinct part of an institution which is primarily engaged in providing comprehensive skilled services and rehabilitative Inpatient care and is duly licensed by the appropriate governmental authority to provide such services, and operating within the scope of such license.[1] | means an institution or a distinct part of an institution which is primarily engaged in providing comprehensive **residential treatment services** and care and is duly licensed by the appropriate governmental authority to provide such services and operating within the scope of such license. |

//

//

//

//

//

//

//

//

---

[1] ECF 13-1, p. 31 of 143. Bolding denotes the changes between the two definitions to assist in visual comparison.

00022

51. The following language is MHPAEA compliant if BCBSIL had used the facility definition of a residential treatment center as its model:

| SKILLED NURSING FACILITY | RESIDENTIAL TREATMENT CENTER |
|---|---|
| means a *facility setting offering a defined course of **medical** intervention and special **treatment and therapeutics** in a controlled environment which also offers a degree of security, supervision, and structure* and is licensed by the appropriated state and local authority to provide such service. *It does not include half-way houses, supervised living, group homes, wilderness programs, boarding houses or other facilities that provide primarily a supportive environment and address long-term social needs, even if **medical care** is provided in such facilities. Patients are medically monitored with 24 hour **psychiatric** availability and 24 hour onsite **psychiatric clinician** service for patients with **Medical/Surgical** conditions. Blue Cross and Blue Shield of Illinois requires that any **skilled nursing facility** must be licensed in the state where it is located, or accredited by a national organization that is recognized by Blue Cross and Blue Shield of Illinois as set forth in its current credentialing policy, and otherwise meets all other credentialing requirements set forth in such policy.*[2] | means a facility setting offering a defined course of therapeutic intervention and special programming in a controlled environment which also offers a degree of security, supervision, and structure and is licensed by the appropriated state and local authority to provide such service. It does not include half-way houses, supervised living, group homes, wilderness programs, boarding houses or other facilities that provide primarily a supportive environment and address long-term social needs, even if counseling is provided in such facilities. Patients are medically monitored with 24 hour medical availability and 24 hour onsite nursing service for patients with Mental Illness and/or Substance Use Disorder. Blue Cross and Blue Shield of Illinois requires that any Mental Illness and/or Substance Use Disorder Residential Treatment Center must be licensed in the state where it is located, or accredited by a national organization that is recognized by Blue Cross and Blue Shield of Illinois as set forth in its current credentialing policy, and otherwise meets all other credentialing requirements set forth in such policy.[3] |

52. These tables demonstrate the disparity between the definitions of residential treatment centers and their analog of skilled nursing facilities.

---

[2] *Id.* The italicized words serve as a visual indicator of how extensively the definition of a skilled nursing center would need to be modified to have the same written requirements as the definition of a residential treatment center. Bolding shows which words Plaintiffs added in the now comparable definitions denote that skilled nursing facilities offer medical and surgical care.

[3] *Id.*

53. Requiring residential treatment centers to provide onsite staff capable of addressing conditions unnecessary to mental health treatment where skilled nursing facilities are not required to provide onsite staff capable of addressing conditions unnecessary to medical/surgical treatment (such as onsite psychiatric clinicians) violates MHPAEA.

54. C.B. seeks a reformation of the terms of the Plan and removal of the offending language so that the evaluation of coverage for mental health treatment at residential treatment centers will be no more restrictive than the evaluation of coverage for medical/surgical treatment at skilled nursing facilities.

**MHPAEA Violation #2 – The Plan Violates MHPAEA When it Deviates from the Neutral Plan Definition of Medical Necessity and Imposes More Stringent Requirements on Receiving Coverage Under the Plan for Mental Health Treatment than it Imposes on Receiving Coverage for Analogous Medical/Surgical Treatment.**

55. The Plan imposes a treatment limitation on all services based on its requirement that services must be "medically necessary" to be covered.

56. The Plan definition of medically necessary is found in the exclusion section of the policy and states: "Medically Necessary means that a specific medical, health care or Hospital service is required, in the reasonable medical judgment of the Claim Administrator, for the treatment or management of a medical symptom or condition and that the service or care provided is the most efficient and economical service which can safely be provided."

57. As indicated, to qualify for services, the care must be provided in the most "efficient and economical" way "which can safely be provided."

58. The Plan requirements to qualify as a skilled nursing facility do not extend beyond licensure by the "appropriate governmental authority."

59. The Plan imposes on residential treatment centers the obligation that they are "licensed by the state and local authority to provide such service. "

14

00024

60. In addition to the licensing requirement, the Plan requires:

    a.  Medical monitoring
    b.  24-hour medical availability
    c.  24-hour onsite nursing

61. The additional services requirements beyond licensure, including the 24-hour onsite nursing requirement for residential treatment centers, increases the cost of care.

62. Based on the opinions of experts in other cases in which Plaintiffs' counsel is involved, the 24-hour onsite nursing requirement increases the cost of care at residential treatment centers without meaningfully improving outcomes.

63. Based on the opinions of experts in other cases in which Plaintiffs' counsel is involved, few residential treatment centers provide 24-hour onsite nursing care.

64. Providing benefits for care at a residential treatment center that employs 24-hour onsite nursing is inconsistent with the Plan language stating that a prerequisite for coverage is that treatment be safely provided in the most economical and efficient manner possible.

65. A 24-hour onsite nursing requirement at skilled nursing facilities does not restrict coverage to the same degree as applying that requirement to residential treatment facilities because 24-hour onsite nursing is a standard component at skilled nursing facilities but is not part of generally accepted standards of care for residential treatment facilities.

**MHPAEA Violation # 3 The Plan Violates MHPAEA by Denying Residential Treatment Center Claims from Facilities that are Duly Licensed While Providing Benefits for Medical/Surgical Claims at Duly Licensed Skilled Nursing Facilities.**

66. Triumph is a licensed residential treatment center under Utah law and meets the appropriate requirements and regulations to maintain that licensure.

67. Defendants' imposition of extra licensure requirements, including the imposition of an exclusive 24-hour onsite nursing provision for residential treatment, violates MHPAEA.

68. While state law, funding, or licensure requirements sometimes mandate that an intermediate level medical facility have nursing staff on-site 24/7, the imposition of those requirements is dependent on rules that are external to the Plan.

69. In contrast, the 24-hour onsite nursing requirement is imposed on every residential treatment center according to the express terms of the Plan.

70. In either case, the Plan violates MHPAEA because the Plan does not exclude coverage for any license skilled nursing facilities that do not have 24-hour onsite nursing.

71.  By requiring 24-hour onsite nurses for all residential treatment centers, BCBSIL excludes coverage for all, or nearly all, residential treatment facilities while giving the appearance to its insureds that residential treatment is a covered benefit.

72. BCBSIL's standards for intermediate level medical care allow it to approve coverage for essentially all licensed skilled nursing facilities.

73. On information and belief, no licensing, accreditation, or regulatory agency, in Utah or otherwise, makes licensure, accreditation, or certification for residential treatment contingent on 24-hour onsite nursing.

74. The actions of BCBSIL and the Plan requiring conditions for coverage that are more stringent than state law licensing requirements violate MHPAEA because the Plan does not impose similar restrictions and coverage limitations on analogous levels of care for treatment of medical and surgical conditions.

//

00026

**MHPAEA Violation #4: The Plan Imposes Requirements for Coverage of Residential Treatment Centers that Exceed Generally Accepted Standards of Care and Does Not Impose Requirements for Coverage on Skilled Nursing Facilities that Exceed Generally Accepted Standards of Care.**

75. Triumph provides treatment in accordance with generally accepted standards of medical practice.

76. These generally accepted standards of medical practice allow supervision at residential treatment centers to be provided by nurses, or individuals with college degrees and one year of treatment center experience, or individuals with a high school diploma and five years of experience.

77. The terms of the Plan allow only a single option for supervision when generally accepted standards allow for three.

78. Accordingly, BCBSIL's imposition of 24-hour onsite nursing supervision places a condition for coverage at Triumph that is more restrictive than generally accepted standards of medical practice.

79. When evaluating whether to provide coverage for skilled nursing facilities, BCBSIL is guided by generally accepted standards of care. It does not impose requirements for coverage that deviate from, or impose more stringent requirements above and beyond, generally accepted standards of care for skilled nursing facilities.

80. The discrepancy in the coverage provided by BCBSIL and the Plan because of their disparate application of treatment limitations on coverage for residential treatment centers compared to their coverage for skilled nursing facilities violates MHPAEA.

81. The violations of MHPAEA by BCBSIL and the Plan are breaches of fiduciary duty and give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

17

(a) A declaration that the actions of the Defendants violate MHPAEA;

(b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the facility eligibility criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their losses;

(g) An order equitably estopping the Defendants from denying the Plaintiff's claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA.

## SECOND CAUSE OF ACTION

### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

82. This cause of action is plead in the alternative and is dependent on Plaintiffs prevailing on the MHPAEA cause of action.

83. If Plaintiffs prevail on their first cause of action, the offending language will either be reformed, or will the Plan terms will be interpreted in a way that the offending language

cannot be used as a basis for denial.

84. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as BCBSIL, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

85. BCBSIL and the Plan failed to provide coverage for R.B.'s treatment in violation of the express terms of the Plan, that do not violate MHPAEA, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

86. ERISA underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

87. The denial letters produced by BCBSIL do little to elucidate whether BCBSIL conducted a meaningful analysis of the Plaintiffs' appeals or whether it provided a "full and fair review." BCBSIL failed to substantively respond to the issues presented in C.B.'s appeals and did not meaningfully address the arguments or concerns that they raised during the appeals process.

88. BCBSIL and the agents of the Plan breached their fiduciary duties to the Plaintiffs when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in the Plaintiffs' interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and

00029

information to claimants upon request, and to provide a full and fair review of R.B.'s claims.

89. The actions of BCBSIL and the Plan in failing to provide coverage for R.B.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

90. In accordance with the facts stated above, C.B. requests payment for R.B.'s treatment at Triumph, or in the alternative, if the Court finds that MHPAEA has been violated, an order to reform policy language to ensure compliance with MHPAEA and a remand for further consideration based on the updated language.

91. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g).

WHEREFORE, the Plaintiffs seek relief as follows:

1.     Judgment in the total amount that is owed for R.B.'s medically necessary treatment at Triumph under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2.     Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' First Cause of Action;

3.     Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4.     For such further relief as the Court deems just and proper.

DATED this 6th day of February, 2024.

By ____s/ Brian S. King_____
        Brian S. King
        Attorney for Plaintiffs

00030

County of Plaintiff's Residence:
Union County, New Jersey

00031